**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| RON BARRY<br>43-18 195th Street<br>Flushing, NY 11358,<br>Derivatively on Behalf of HUMAN<br>GENOME SCIENCES, INC.,<br><br>            Plaintiff,<br>   v.<br><br>H. THOMAS WATKINS<br>4705 Monaco Circle<br>Bethesda, MD 20814,<br><br>DAVID P. SOUTHWELL<br>350 Main Street<br>Concord, MA 01742,<br><br>TIMOTHY C. BARABE<br>1855 Jones Street<br>San Francisco, CA 94109,<br><br>ARGERIS N. KARABELAS<br>129 Hodge Road<br>Princeton, NJ 08540,<br><br>RICHARD J. DANZIG<br>3670 Upton Street N.W.<br>Washington, DC 20008,<br><br>AUGUSTINE LAWLOR<br>11 Carriage Lane<br>Salem, NH 03079,<br><br>TUAN HA-NGOC<br>8 Kitson Park Drive<br>Lexington, MA 02421,<br><br>ROBERT C. YOUNG<br>150 Lynnebrook Lane<br>Philadelphia, PA 19118,<br><br><br>[caption continued on next page] | Civil Action No.:<br><br>VERIFIED SHAREHOLDER DERIVATIVE<br>COMPLAINT FOR BREACH OF<br>FIDUCIARY DUTY, WASTE OF<br>CORPORATE ASSETS, AND UNJUST<br>ENRICHMENT<br><br><br>**DEMAND FOR JURY TRIAL** |

MAXINE GOWEN                                    )
19 Paper Mill Road                             )
Newton Square, PA 19073,                       )
                                               )
JOHN L. LAMATTINA                              )
127 Wamphassuc Road                            )
Stonington, CT 06378,                          )
                                               )
JÜRGEN DREWS                                   )
6983 Bridgestone Ct                            )
Naples, FL 34108,                              )
                                               )
SUSAN D. BATESON                               )
1200 N. Nash Street,                           )
Apts. 203 and 841                              )
Arlington, VA 22209,                           )
                                               )
CURRAN M. SIMPSON                              )
2149 Thurston Road                             )
Frederick, MD 21704,                           )
                                               )
JAMES H. DAVIS                                 )
6705 Mink Hollow Road                          )
Highland, MD 20777,                            )
                                               )
BARRY A. LABINGER                              )
7200 Fairfax Road                              )
Bethesda, MD 20814,                            )
                                               )
-and-                                          )
                                               )
DAVID C. STUMP                                 )
11501 Dalyn Terrace                            )
Potomac, MD 20854,                             )
                                               )
                        Defendants,            )
           -and-                               )
                                               )
HUMAN GENOME SCIENCES, INC.                    )
14200 Shady Grove Road                         )
Rockville, MD 20850,                           )
                                               )
                Nominal Defendant.             )

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action by plaintiff on behalf of nominal defendant Human Genome Sciences, Inc. ("HGS" or the "Company") against certain of its fiduciaries.  This action seeks to remedy the Individual Defendants' (as defined herein) breaches of fiduciary duty, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses to HGS and other damages, such as to its reputation and goodwill.  This matter arises out of improper statements about the efficacy, safety, and tolerability of the Company's primary product, BENLYSTA® (trade name for belimumab).

2.      HGS, a biopharmaceutical company headquartered in Rockville, Maryland, uses the human DNA sequence to develop protein and antibody drugs to treat such diseases as systemic lupus erythmatosis ("lupus"), hepatitis C, anthrax disease, cancer, rheumatoid arthritis, and HIV/AIDS.

3.      HGS sought for years to make history by obtaining the first U.S. Food and Drug Administration (the "FDA") approved drug for the autoimmune disease, lupus, in more than five decades.  With five million people worldwide, including approximately 1.5 million people in the United States, afflicted with lupus, BENLYSTA was touted as a potential blockbuster drug that would advance HGS's business.

4.      Although BENLYSTA was introduced to the market as a breakthrough drug bringing tremendous hope to those afflicted with lupus, results from clinical studies soon suggested that its side effects were just too harmful to its users' health.  The Individual Defendants knew or recklessly failed to discover that the drug was associated with suicide in clinical studies leading as far back as 2003, and continuing on through 2009.  The Individual

Defendants, by their failure to maintain internal controls and by their failure to oversee and properly manage the Company, caused HGS to conceal the truth about BENLYSTA and its disturbing side effects from the public, all the while causing the Company massive liability by raising hundreds of millions of dollars in stock offerings based on improper statements about BENLYSTA.

5.      On the heels of these stock offerings generating hundreds of millions of dollars in capital infusion, the FDA issued a briefing document in advance of its advisory panel meeting on BENLYSTA.  In this briefing document, the FDA scientists disclosed BENLYSTA's association with suicide and questioned the drug's value, asking, "*If belimumab only has a modest effect for some patients and manifestations, is a possible increased risk of death, infection, or neuropsychiatric adverse effects worth the potential benefit?*"  This was the first time the public learned of the association between BENLYSTA and suicide.

6.      The effect of the FDA's disclosure was staggering.  When the truth regarding the Company's flagship product emerged, HGS's market capitalization plummeted by over $543 million, or nearly 11% in only one day.  The present market capitalization has dropped nearly 70% since the truth about the Individual Defendants' improper statements came to light and the claimed sales and market for the drug failed to develop.  HGS is now subject to two securities fraud class action lawsuits filed in the United States District Court for the District of Maryland. The securities fraud lawsuits expose the Company to potentially billions of dollars in damages.

7.      The Insider Selling Defendants (as defined herein) did not let their own wealth suffer, however, cashing out before the truth emerged.  These Insider Selling Defendants used their knowledge of HGS's material, non-public information to sell over $37 million of their

personal holdings while the Company's stock was artificially inflated adding to the hundreds of millions of dollars' worth of stock the Company already unloaded on the unsuspecting public in multiple stock offerings.

8.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company with their faithless actions.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by 28 U.S.C. section 1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court in accordance with 28 U.S.C. section 1391(a) because: (i) HGS maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to HGS, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Ron Barry was a shareholder of HGS at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current HGS shareholder.  Plaintiff is a citizen of New York.

**Nominal Defendant**

13.     Nominal Defendant HGS is a Delaware corporation with principal executive offices located at 14200 Shady Grove Road, Rockville, Maryland.  HGS is a biopharmaceutical company that is co-developing BENLYSTA, a product for lupus, with GlaxoSmithKline ("GSK").  Under the co-development and commercialization agreement entered into with GSK, HGS is responsible for the global supply of BENLYSTA.

**Defendants**

14.     Defendant H. Thomas Watkins ("Watkins") is HGS's Chief Executive Officer ("CEO") and a director and has been since November 2004 and President and has been since December 2005.  Watkins is also named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Watkins knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.  HGS paid Watkins the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $716,923 | $8,438,175 | $550,000 | $150,225 | $9,855,323 |
| 2009 | $700,000 | $131,100 | $1,050,000 | $30,501 | $1,911,601 |

Watkins is a citizen of Maryland.

15.     Defendant David P. Southwell ("Southwell") is HGS's Executive Vice President and Chief Financial Officer ("CFO") and has been since March 2010.  Southwell was also an HGS director from July 2008 to March 2010 and a member of HGS's Audit Committee in 2009. Southwell is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Southwell knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements; and (iii) as a member of the Audit Committee, reviewed and approved these improper statements.   HGS paid Southwell the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $330,000 | $4,934,958 | $200,000 | $163,876 | $5,628,834 |

Southwell is a citizen of Massachusetts.

16.     Defendant Timothy C. Barabe ("Barabe") was HGS's Senior Vice President and CFO from July 2006 to March 2010.  Barabe is also named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Barabe knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's

press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.   While in possession of material, non-public information concerning HGS's true business health, Barabe sold 115,380 shares of his stock for $3,061,255.57 in proceeds.   HGS paid Barabe the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $102,200 | - | - | $356,607 | $458,807 |
| 2009 | $369,991 | $28,842 | $300,000 | $8,147 | $706,980 |

Barabe is a citizen of California.

17.     Defendant Argeris N. Karabelas ("Karabelas") is HGS's Chairman of the Board of Directors (the "Board") and has been since October 2004 and a director and has been since 2002. Karabelas is also named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Karabelas knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.   HGS paid Karabelas the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $98,500 | $208,626 | $307,126 |
| 2009 | $77,000 | $17,256 | $94,256 |

Karabelas is a citizen of New Jersey.

18.     Defendant Richard J. Danzig ("Danzig") is an HGS director and has been since 2001.  Danzig is also a member of HGS's Audit Committee and has been since at least March 2008.   Danzig is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Danzig knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements; and (iii) as a member of the Audit Committee, reviewed and approved these improper statements.   HGS paid Danzig the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $62,000 | $208,626 | $270,626 |
| 2009 | $59,750 | $17,256 | $77,006 |

Danzig is a citizen of Washington, DC.

19.     Defendant Augustine Lawlor ("Lawlor") is an HGS director and has been since 2004.  Lawlor was also a member of HGS's Audit Committee from at least March 2008 to at least March 2011.  Lawlor is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Lawlor knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements; and (iii) as a member of the Audit

Committee, reviewed and approved these improper statements.  HGS paid Lawlor the following

compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $10,288 | $66,962 | $208,626 | $285,876 |
| 2009 | $34,375 | $34,375 | $17,256 | $86,006 |

Lawlor is a citizen of New Hampshire.

20.     Defendant Tuan Ha-Ngoc ("Ha-Ngoc") is an HGS director and has been since

2005.  Ha-Ngoc is also Chairman of HGS's Audit Committee and has been since at least March

2009 and a member of that committee and has been since at least March 2008.  Ha-Ngoc is

named as a defendant in securities class action complaints that allege he violated sections 10(b)

and 20(a) of the Exchange Act.  Ha-Ngoc knowingly or recklessly: (i) made improper statements

in the Company's press releases and public filings regarding the serious side effects associated

with its new purported breakthrough lupus drug, BENLYSTA; (ii) failed to establish and

maintain internal controls which would have prevented the Company from disseminating these

improper statements; and (iii) as a member of the Audit Committee, reviewed and approved

these improper statements.  HGS paid Ha-Ngoc the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $41,169 | $24,581 | $208,626 | $274,376 |
| 2009 | $78,000 | - | $17,256 | $95,256 |

Ha-Ngoc is a citizen of Massachusetts.

21.     Defendant Robert C. Young ("Young") is an HGS director and has been since

2005.  Young is also named as a defendant in securities class action complaints that allege he

violated sections 10(b) and 20(a) of the Exchange Act.  Young knowingly or recklessly: (i) made

improper statements in the Company's press releases and public filings regarding the serious side

effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.  HGS paid Young the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $38,264 | $5,486 | $208,626 | $252,376 |
| 2009 | $16,875 | $16,875 | $17,256 | $51,006 |

Young is a citizen of Pennsylvania.

22.     Defendant Maxine Gowen ("Gowen") is an HGS director and has been since 2008.  Gowen is also named as a defendant in securities class action complaints that allege she violated sections 10(b) and 20(a) of the Exchange Act.  Gowen knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.  HGS paid Gowen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $34,251 | $11,249 | $208,626 | $254,126 |
| 2009 | - | $33,000 | $17,256 | $50,256 |

Gowen is a citizen of Pennsylvania.

23.     Defendant John L. LaMattina ("LaMattina") is an HGS director and has been since 2008.  LaMattina is also named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  LaMattina knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings

regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.  HGS paid LaMattina the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $54,000 | $208,626 | $262,626 |
| 2009 | $52,000 | $17,256 | $69,256 |

LaMattina is a citizen of Connecticut.

24.     Defendant Jürgen Drews ("Drews") was an HGS director from 1998 to May 2011. Drews is also named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Drews knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings regarding the serious side effects associated with its new purported breakthrough lupus drug, BENLYSTA; and (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.   While in possession of material, non-public information concerning HGS's true business health, Drews sold 112,902 shares of his stock for $2,633,630.29 in proceeds.  HGS paid Drews the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $21,169 | $21,081 | $208,626 | $250,876 |
| 2009 | $23,875 | $15,375 | $17,256 | $56,506 |

Drews is a citizen of Florida.

25.     Defendant Susan D. Bateson ("Bateson") is HGS's Senior Vice President, Human Resources and has been since December 2000.  Bateson was also HGS's Vice President, Human Resources from January 1997 to December 2000.  While in possession of material, non-public

information concerning HGS's true business health, Bateson sold 417,354 shares of her stock for $10,668,387.73 in proceeds.  Bateson is a citizen of Virginia.

26.     Defendant Curran M. Simpson ("Simpson") is HGS's Senior Vice President, Operations and has been since December 2005.  Simpson was also HGS's Vice President, Manufacturing Operations from March 2003 to December 2005.  While in possession of material, non-public information concerning HGS's true business health, Simpson sold 280,703 shares of his stock for $6,919,160.90 in proceeds.  Simpson is a citizen of Maryland.

27.     Defendant James H. Davis ("Davis") is HGS's Executive Vice President, General Counsel, and Secretary and has been since December 2003.  Davis was also HGS's Senior Vice President, General Counsel, and Secretary from May 1997 to December 2003.  While in possession of material, non-public information concerning HGS's true business health, Davis sold 186,000 shares of his stock for $5,219,313.01 in proceeds. HGS paid Davis the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $452,692 | $2,531,453 | $225,000 | $14,230 | $3,223,375 |
| 2009 | $440,000 | $39,330 | $450,000 | $14,230 | $943,560 |

Davis is a citizen of Maryland.

28.     Defendant Barry A. Labinger ("Labinger") is HGS's Executive Vice President and Chief Commercial Officer and has been since August 2005.  Labinger was also HGS's Interim CFO from December 2005 to July 2006 and in March 2010.  While in possession of material, non-public information concerning HGS's true business health, Labinger sold 170,696 shares of

his stock for $4,830,532.52 in proceeds.  HGS paid Labinger the following compensation as an

executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2010 | $488,046 | $2,531,453 | $250,000 | $9,822 | $3,279,321 |
| 2009 | $477,300 | $39,330 | $430,000 | $9,822 | $956,452 |

Labinger is a citizen of Maryland.

29.     Defendant David C. Stump ("Stump") is HGS's Executive Vice President,

Research and Development and has been since December 2003.  Stump was also HGS's Senior

Vice President, Drug Development from October 1999 to December 2003.  While in possession

of material, non-public information concerning HGS's true business health, Stump sold 134,000

shares of his stock for $3,818,094.60 in proceeds.  HGS paid Stump the following compensation

as an executive:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2010 | $492,692 | - | $2,531,453 | $245,000 | $11,809 | $3,280,954 |
| 2009 | $479,231 | $110,000 | $39,330 | $540,000 | $11,809 | $1,180,370 |

Stump is a citizen of Maryland.

30.     The defendants identified in ¶¶14-16, 25-29 are referred to herein as the "Officer

Defendants."  The defendants identified in ¶¶14-15, 17-24 are referred to herein as the "Director

Defendants."   The defendants identified in ¶¶15, 18-20 are referred to herein as the "Audit

Committee Defendants."  The defendants identified in ¶¶16, 24-29 are referred to herein as the

"Insider Selling Defendants."  Collectively, the defendants identified in ¶¶14-29 are referred to

herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers, directors, and/or fiduciaries of HGS and because of their ability to control the business and corporate affairs of HGS, the Individual Defendants owed and owe HGS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage HGS in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of HGS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each officer and director of the Company owes to HGS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. Finally, their roles as directors and officers of HGS require them to install effective internal controls, make reasonable inquiry, and maintain oversight and supervision of the Company.

**Additional Duties of the Audit Committee Defendants**

33.     Under HGS's Audit Committee Charter, the Audit Committee Defendants, Danzig, Ha-Ngoc, and Lawlor, owed and owe additional duties and obligations to the Company. The Charter requires the Audit Committee Defendants to:

Obtain and review, at least annually, management's statement of responsibility for

establishing and maintaining adequate internal controls and procedures for financial reporting and disclosure controls and an assessment of the effectiveness of such internal controls and procedures for financial reporting as well as its disclosure controls based on management's evaluation of those controls and procedures as of the end of the most recent filed year, to be included in the [Company's] annual report on Form 10-K, in advance of such filing.

\* \* \*

Review the [Company's] quarterly consolidated financial statements with management and the independent accountants prior to the filing of the [Company's] Quarterly Reports on Form 10-Q and the disclosures of each of the [CEO] and [CFO] required to be included therein, and review with the independent accountants any items identified by them for discussion with the [Audit] Committee.  Review with management its quarterly evaluation of the effectiveness of the design and operation of the [Company's] internal controls and procedures for financial reporting as well as its disclosure controls and procedures. The Chair of the [Audit] Committee may represent and act on behalf of the entire [Audit] Committee for purposes of this review.

**Control, Access, and Authority**

34.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of HGS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

35.     Because of their advisory, executive, managerial, and directorial positions with HGS, each of the Individual Defendants had access to adverse, non-public information about the operations of HGS.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information concerning HGS's purportedly groundbreaking lupus treatment, BENLYSTA.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HGS, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

37.     To discharge their duties, the officers and directors of HGS were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of HGS were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     refrain from acting upon material, inside corporate information to benefit themselves;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how HGS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

38.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of HGS, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of HGS's Board.

39.     The Individual Defendants breached their fiduciary duties as detailed herein.  The Individual Defendants issued improper statements regarding the serious side effects associated with its new purported breakthrough lupus treatment, and failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements.  These concerns over BENLYSTA's life-threatening side effects stemmed from HGS's studies and trials over the course of several years, but had remained undisclosed by the Company and unknown to the public prior to the FDA's revelations in November 2010.

40.     Despite their possession of non-public, materially adverse information relating to the Company, the Individual Defendants disregarded the fact that adverse material facts were not disclosed to, and were being concealed from, the public. The Individual Defendants breached

their fiduciary duties by their failure to: (i) prevent the Company from violating the law; (ii) install internal controls designed to prevent such wrongdoing; and (iii) monitor and manage the Company.

41.     Due to the Individual Defendants' breaches of their fiduciary duties and attendant violations of their obligations as directors and officers of HGS, the Company is now subject to two securities fraud lawsuits filed in the United States District Court for the District of Maryland. As a result, HGS has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of HGS, regarding the Individual Defendants' management of HGS's operations and the value of the Company's products; (ii) facilitate defendants Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews's illicit sale of over $37 million of their personally held shares while in possession of material, non-public information; and (iii) enhance the Individual Defendants' executive and directorial positions at HGS and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In

furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

44.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper statements.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND SURROUNDING PURPORTED BREAKTHROUGH**

48.     On March 9, 2011, HGS and GSK announced FDA approval of BENLYSTA, for the treatment of autoantibody-positive adult patients with active lupus who are receiving standard therapy.  BENLYSTA was the first new approved drug for lupus in more than fifty years – and the first HGS product to receive FDA approval.

49.     Lupus is an autoimmune disease, which means the body's immune system mistakenly attacks healthy tissue.  This leads to long-term (chronic) inflammation.  Lupus is much more common in women than men.  Although the disease may occur at any age, it appears most often in people between the ages of ten and fifty.  African Americans and Asians are affected more often than people from other races.  Approximately five million people worldwide, including approximately 1.5 million people in the United States, suffer from various forms of lupus.

50.     Given the fact that the underlying cause of autoimmune diseases is not fully known and the fact that there is no cure for lupus, the goal of treatment is to control symptoms which include extreme fatigue, painful and swollen joints, unexplained fever, skin rash, and kidney problems.  The disease can even lead to arthritis, kidney failure, heart and lung inflammation, central nervous system abnormalities, inflammation of the blood vessels, and blood disorders.  Due to the severity of this disease, BENLYSTA was touted as a huge breakthrough.

51.     Between October 2003 and February 2006, HGS conducted a Phase 2 placebo-controlled, double-blind clinical study of BENLYSTA, with the study code-named L02.

Following completion of the L02 study, another study, code-named LBSL99, began tracking the patient participants from L02.  The LBSL99 study is ongoing.

52.     In August 2006, HGS and GSK entered into a definitive co-development and co-commercialization agreement under which HGS had responsibility for conducting the BENLYSTA Phase 3 trials with assistance from GSK.  The two companies agreed to share equally in Phases 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement.

53.     After this agreement was formalized, HGS conducted the Phase 3 development program, which included two double-blind, placebo-controlled trials – BLISS-52 and BLISS-76. These trials evaluated the efficacy and safety of BENLYSTA plus standard of care, versus placebo plus standard of care, in autoantibody-positive patients with lupus.  These were the largest clinical trial programs ever conducted in lupus patients.  BLISS-52 randomized and treated 865 patients at ninety clinical sites in thirteen countries, primarily in Asia, South America, and Eastern Europe.  BLISS-76 enrolled and randomized 826 patients at 133 clinical sites in nineteen countries, primarily in North America and Europe. The BLISS-52 study began in May of 2007 and ended in July 2009.  The BLISS-76 study began in December 2006 and ended in October 2010.

**IMPROPER STATEMENTS REGARDING PURPORTED BREAKTHROUGH
AND STOCK OFFERINGS**

54.     On November 28, 2008, HGS filed a shelf registration[1] statement with the U.S.

---

[1] A shelf registration is a registration of a new stock issue which can be prepared up to three years in advance, so that the issue can be offered quickly as soon as funds are needed or market

Securities and Exchange Commission (the "SEC") registering up to $400 million of HGS

securities for sale.  This shelf registration statement was amended on April 30, 2009 and declared

effective by the SEC on May 4, 2009 (the "Shelf Registration Statement").   The Shelf

Registration Statement was signed by defendants Watkins, Barabe, Karabelas, Danzig, Drews,

Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell, and Young, and expressly stated: "We

incorporate by reference any filings we make with the SEC after the date of this prospectus under

Section 13(a), 13(c), 14 or 15(d) of the Exchange Act," and any subsequently-filed prospectuses.

55.     On July 20, 2009, HGS issued a press release announcing the positive results of

the BLISS-52 study.  The press release contained comments from HSG's President and CEO,

defendant Watkins, and stated in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC
> (GSK) today announced that BENLYSTA™ (belimumab, formerly LymphoStat-
> B®) met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 trials
> in patients with serologically active systemic lupus erythematosus (SLE). In the
> placebo-controlled BLISS-52 study, the ***results showed that belimumab plus
> standard of care achieved a clinically and statistically significant improvement
> in patient response rate at Week 52, compared with standard of care alone.
> Study results also showed that belimumab was generally well tolerated, with
> adverse event rates comparable between belimumab and placebo treatment
> groups.***
>
> "The BLISS-52 results demonstrated that BENLYSTA has the potential to
> become the first new approved drug in decades for people living with systemic
> lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS.
> "Given the limited treatment options currently available, patients would benefit
> greatly from potential new treatments. BENLYSTA is an outstanding example of
> the type of treatment HGS is working to develop and bring to patients. Assuming
> positive results in November from our second Phase 3 trial of BENLYSTA, we

conditions are favorable.   Only the largest corporate issuers can take advantage of shelf
registrations.

and GSK plan to submit marketing applications in the United States, Europe and other regions in the first half of 2010."

56.    On July 29, 2009, HSG filed a pricing prospectus with the SEC indicating it had pulled from its $400 million shelf and sold 23,215,000 shares of its common stock at a price of $14.00 per share (the "July Registration Statement").  The July Registration Statement expressly incorporated by reference the improper July 20, 2009 press release and any filings made by HGS subsequent to the July Registration Statement.

57.    Less than one week later, on August 3, 2009, HGS issued a press release announcing the closing of its July 29, 2009 public offering, stating in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 26,697,250 newly issued shares of its common stock at a price to the public of $14.00 per share, which includes 3,482,250 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $356.7 million, after deducting the underwriting discount and estimated offering expenses.

58.    On October 20, 2009, HGS issued a press release announcing the positive Phase 3 study results for BENLYSTA in lupus.  The press release specifically touted the success of the BENLYSTA treatment and its low "adverse event rates," stating in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-52, the first of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The data, which will be presented today in Philadelphia at the 73rd Annual Scientific Meeting of the American College of Rheumatology (ACR), demonstrate that, in BLISS-52, belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also show that ***belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.***
>
> ***"The BLISS-52 Phase 3 results presented at ACR demonstrate that the efficacy of treatment with BENLYSTA plus standard of care was superior to that of***

- 22 -

*placebo plus standard of care,"* said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "These data were statistically significant and were strongly supported across multiple measures of clinical effect and multiple time-points. Of note, a greater percentage of patients receiving BENLYSTA were able to reduce their use of steroids."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "*We have been pleased by the consistency of benefit demonstrated by belimumab in the BLISS-52 study*, and we hope to confirm these results in the second Phase 3 study which is to report shortly. We very much hope that we will be able to deliver a new option for the treatment of this debilitating disease." Belimumab is an investigational drug and the first in a new class of drugs called BLyS-specific inhibitors. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

59.    On October 29, 2009, HGS amended its Shelf Registration Statement and filed a prospectus (the "Prospectus") with the SEC.  The amendment to the Shelf Registration Statement expressly incorporated by reference the July 20th and August 3rd press releases and subsequently filed  prospectuses, and was signed by defendants Watkins, Barabe, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell, and Young.

60.    On November 2, 2009, HGS issued a press release announcing positive results in the second of two Phase 3 trials of BENLYSTA. The press release contained comments from HGS's President and CEO, defendant Watkins, and stated in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTA™ (belimumab) met the primary endpoint in BLISS-76, the second of two pivotal Phase 3 trials in seropositive patients with systemic lupus erythematosus (SLE). BLISS-76 study results through 52 weeks showed that *belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate* as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. *Study results also showed that belimumab was generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.*

"The BLISS-76 results confirm our view that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We take great pride in the innovation and scientific rigor that has made it possible to bring BENLYSTA to this point. We plan to submit marketing applications in the first half of 2010, following discussions with regulatory authorities in the United States, Europe and other regions. We will continue to work with GSK to advance this drug to the market where it may benefit patients with significant need."

61.    On November 30, 2009, HGS filed a supplement to its Prospectus (the "Prospectus Supplement") with the SEC, once again touting the effectiveness of BENLYSTA. The Prospectus Supplement stated:

**BLISS-52**

On July 20, 2009, we, together with GSK, announced that BENLYSTA met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 clinical trials in patients with serologically positive SLE. ***Based on an intention-to-treat analysis, BENLYSTA met its primary efficacy endpoint of superiority versus placebo at Week 52. A clinically and statistically significant improvement was shown in patient response rate for BENLYSTA plus standard of care versus placebo plus standard of care***: 57.6% for 10 mg/kg BENLYSTA, 51.7% for 1 mg/kg BENLYSTA, and 43.6% for placebo (p=0.0006 and p=0.011 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo). Patient response was defined by an improvement in SELENA SLEDAI (a weighted cumulative index of lupus disease activity) score of 4 points or greater, no clinically significant BILAG (a clinical measure of lupus disease activity) worsening, and no clinically significant worsening in the Physician's Global Assessment (a measure of disease activity in clinical trials). Results for each individual component of the patient response rate were consistent with the overall improvement shown for the primary endpoint.

62.    Public statements by the Individual Defendants continuously showed that BENLYSTA was generally well tolerated, with rates of overall adverse events, serious adverse events, infections, and fatalities comparable between BENLYSTA and placebo treatment.

63.    On December 3, 2009, HGS filed a pricing prospectus with the SEC indicating that HGS had pulled down another 15,500,000 shares of its common stock from its $400 million

shelf, for sale at a price of $26.75 per share (the "December Registration Statement"). The December Registration Statement expressly incorporated by reference the July 20th, August 3rd, October 20th, and November 2nd press releases (referenced above), containing improper statements regarding the purported positive results and low "adverse event rates" BENLYSTA was achieving in clinical studies.   The December Registration Statement further incorporated by reference any filings made by HGS subsequent to the December Registration Statement.   Thus, the December Registration Statement contained multiple improper statements.

64.     On December 8, 2009, HGS issued a press release announcing the closing of its public offering of 17,825,000 newly issued shares of common stock at a price of $26.75 per share.   The press release, which included comments from defendant Watkins, stated in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 17,825,000 newly issued shares of its common stock at a price to the public of $26.75 per share, which includes 2,325,000 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $456.3 million, after deducting the underwriting discount and estimated offering expenses.

65.     On April 20, 2010, the Company issued a press release announcing its topline seventy-six week results of its Phase 3 trial of BENLYSTA. The press release included comments from defendant Watkins regarding the "favorable safety profile" achieved by BENLYSTA.  The press release stated:

> At Week 76 in the BLISS-76 study, belimumab plus standard of care showed higher response rates compared with placebo plus standard of care as measured by the SLE Responder Index; however, this secondary endpoint did not reach statistical significance. Study results also showed that ***belimumab continued to be generally well tolerated***, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

*"A positive overall picture has emerged from our pivotal Phase 3 studies of BENLYSTA, including its achievement of statistical significance on the primary efficacy endpoint at Week 52 with a favorable safety profile in both BLISS-52 and BLISS-76,"* said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We view the results of these studies as strongly supportive of our view that BENLYSTA has the potential to become the first new approved drug in more than 50 years for people living with systemic lupus."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Based on the totality of data in BLISS-52 and BLISS-76, we believe that belimumab could deliver a significant therapeutic option for patients with lupus, a chronic condition which has a devastating effect on the lives of patients living with the disease."

66.    On June 10, 2010, HGS issued a press release announcing its submission of a Biologics License Application ("BLA") to the FDA for market approval of BENLYSTA for the purposes of treating lupus.   The submission touted the fact that study results showed that BENLYSTA was effective and well tolerated by patients.   The press release stated in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced that it has submitted a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for approval to market BENLYSTA® (belimumab) for the treatment of systemic lupus erythematosus (SLE).

The BLA submission includes the results of two pivotal Phase 3 clinical trials in autoantibody-positive patients with SLE showing that belimumab met its primary endpoint. In the Phase 3 studies, known as BLISS-52 and BLISS-76, *belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate* as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. *Study results also showed that belimumab was generally well tolerated* in BLISS-52 and BLISS-76, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups. The design of the two trials was similar, but the duration of therapy in the two studies was different – 52 weeks for BLISS-52 and 76 weeks for BLISS-76. HGS designed the Phase 3 program for belimumab in collaboration with GlaxoSmithKline (GSK) and leading international SLE experts, and in consultation with the FDA. The two studies treated a total of 1,684 patients.

67.   On June 17, 2010, HGS issued a press release discussing the Company's announcement of the positive BLISS-76 results, touting the fact that BENLYSTA is the first lupus medicine that has reached such a late state of clinical development with positive results. The press release stated in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The results will be presented today in Rome at the 2010 Congress of the European Leagueja Against Rheumatism (EULAR).
>
> "The BLISS-76 Phase 3 results presented at EULAR extend the findings of previous studies and reinforce our belief that belimumab, assuming regulatory approval, could deliver a significant therapeutic option for seropositive patients with systemic lupus," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "In both of its pivotal Phase 3 trials in these patients, belimumab 10 mg/kg met its primary endpoint. ***The efficacy of treatment with belimumab plus standard of care compared with placebo plus standard of care was superior in both studies, with overall adverse event rates for belimumab comparable to placebo.***"
>
> Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, ***"Belimumab is the first medicine developed specifically for lupus that has reached this late stage of clinical development with positive results.*** The BLISS-76 results presented at EULAR, taken together with the results of BLISS-52, reinforce our belief that belimumab may play an important role for patients living with lupus."

68.   On August 19, 2010, HGS issued a press release announcing the FDA's priority review designation for BENLYSTA as a breakthrough treatment for lupus.  Even at this late stage of development, defendant Watkins once again touted the drug's positive potential without mentioning a word about the clinical studies that linked the drug to life-threatening side effects, particularly suicide.  The press release stated in part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that the U.S. Food and Drug Administration (FDA) has

granted a priority review designation to BENLYSTA® (belimumab) as a potential treatment for systemic lupus erythematosus (SLE). *A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists.* The FDA has assigned belimumab a Prescription Drug User Fee Act (PDUFA) target date of December 9, 2010.

The Biologics License Application (BLA) for belimumab was submitted to the FDA on June 9, 2010, and includes the results of two pivotal Phase 3 clinical trials that treated a total of 1,684 autoantibody-positive patients with SLE. HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts, and in consultation with the FDA.

"We are very pleased that FDA has chosen to grant priority review to belimumab, the first in a new class of drugs called BLyS-specific inhibitors," said H. Thomas Watkins, President and Chief Executive Officer, HGS. *"We believe that the priority review designation speaks both to the significant medical need of people living with lupus and to the potential belimumab may hold as a new treatment option for these patients."*

69.     These above-referenced statements were improper because they misrepresented and failed to disclose the materially adverse fact that HGS's potential new drug BENLYSTA was associated with suicide in clinical studies of the drug, a fact which was known or recklessly ignored by the Director Defendants and known or recklessly or with gross negligence, ignored by the other defendants.

**THE TRUTH ABOUT THE PURPORTED BREAKTHROUGH EMERGES**

70.     On November 12, 2010, the FDA posted briefing documents pertaining to the upcoming BENLYSTA hearing of the FDA Advisory Committee scheduled for November 16, 2010.  These briefing documents disclosed BENLYSTA's association with suicide for the first time to the public, stating in relevant part:

*There were two completed suicides across the double-blind placebo controlled studies, both in patients treated with belimumab* (one each in study L02 and study C1057). In addition there was another completed suicide in a belimumab treated patient during the safety extension period of study L02 (study L99). *There*

*were four cases of suicide attempts or suicidal ideation, all in patients treated with belimumab* (one each in placebo-controlled studies L02 and C1057, and two in the safety extension period of study L02 called study L99).

\* \* \*

Clearly there is a need for effective therapies in SLE. However whether belimumab's benefits sufficiently outweigh its risks is the crux of the issue. Given that flares and steroid reduction may not be impacted, is a reduction of 4 points in the SELENASLEDAI (the main component driving Study 1056's efficacy result) clinically meaningful? *If belimumab only has a modest effect for some patients and manifestations, is a possible increased risk of death, infection, or neuropsychiatric adverse effects worth the potential benefit?*

71.     On this news, HGS's market capitalization plunged nearly 11%, or over $543 million in only one day.

72.     The emergence of the truth concerning BENLYSTA's efficacy, safety, and tolerability caused the FDA to seek additional information on the drug and delay the scheduled December 2010 approval decision until March 2011.

73.     With the truth regarding the improper statements absorbed in the market, the FDA's approval of the drug in March 2011 brought lackluster results for the Company.  The present market capitalization has dropped nearly 70% since the truth about the Individual Defendants' improper statements came to light as BENLYSTA sales have fallen significantly short of forecasts.  BENLYSTA was far from the blockbuster drug the Company led the market to believe.

74.     The dissemination of the materially false and misleading statements was the direct result of the Individual Defendants' abdication of their fiduciary duties. Despite their knowledge or reckless disregard for BENLYSTA's association with suicide in clinical trial studies, the Individual Defendants continued to misrepresent the potential risks and associations and failed to implement proper safeguards.  The Individual Defendants failed to prevent HGS's officers and

directors from disseminating improper statements to the public and failed to install internal controls designed to maintain oversight and manage the Company so that it does not act in violation of the law.

### INSIDER SALES BY DEFENDANTS BATESON, SIMPSON, DAVIS, LABINGER, STUMP, BARABE, AND DREWS

75.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of HGS's material, non-public information to sell their personal HGS holdings while the Company's stock was artificially inflated.  As officers and directors of HGS, defendants Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews were privy to material, non-public information about the Company's true business health especially relating to the future prospects of its purported breakthrough drug, BENLYSTA.

76.     While in possession of this knowledge, defendant Bateson sold 417,354 shares of her personally held HGS stock for proceeds of $10,668,387.73.  Bateson's sales were timed to maximize profit from HGS's then artificially inflated stock price.  Bateson's sales are suspicious given that her stock sales represented 87% of her holdings as demonstrated by the chart below:

| Shares Sold During Sales Period ("SP") | 417,354 |
|---|---|
| Shares Remaining After Sales | 60,358 |
| Total Shares Before Sales | 477,712 |
| **Total Proceeds from Sales** | **$10,668,387.73** |
| **% of Total Ownership Sold During SP** | **87.37%** |

77.     While in possession of this knowledge, defendant Simpson sold 280,703 shares of his personally held HGS stock for proceeds of $6,919,160.90.  Simpson's sales were timed to maximize profit from HGS's then artificially inflated stock price.  Simpson's sales are suspicious given that his stock sales represented 91% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 280,703 |
| Shares Remaining After Sales | 25,281 |
| Total Shares Before Sales | 305,984 |
| **Total Proceeds from Sales** | **$6,919,160.90** |
| **% of Total Ownership Sold During SP** | **91.74%** |

78.     While in possession of this knowledge, defendant Davis sold 186,000 shares of his personally held HGS stock for proceeds of $5,219,313.01.   Davis's sales were timed to maximize profit from HGS's then artificially inflated stock price.   Moreover, as the Company's General Counsel, Davis knew of the failure to comply with the FDA's regulations.   Davis's sales are suspicious given that his stock sales represented 67% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 186,000 |
| Shares Remaining After Sales | 88,739 |
| Total Shares Before Sales | 274,739 |
| **Total Proceeds from Sales** | **$5,219,313.01** |
| **% of Total Ownership Sold During SP** | **67.70%** |

79.     While in possession of this knowledge, defendant Labinger sold 170,696 shares of his personally held HGS stock for proceeds of $4,830,532.52.   Labinger's sales were timed to maximize profit from HGS's then artificially inflated stock price.   Labinger's sales are suspicious given that his stock sales represented 100% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 170,696 |
| Shares Remaining After Sales | 0 |
| Total Shares Before Sales | 170,696 |
| **Total Proceeds from Sales** | **$4,830,532.52** |
| **% of Total Ownership Sold During SP** | **100.00%** |

80.     While in possession of this knowledge, defendant Stump sold 134,000 shares of his personally held HGS stock for proceeds of $3,818,094.60.   Stump's sales were timed to maximize profit from HGS's then artificially inflated stock price.   Moreover, as the Company's Executive Vice President of Research and Development, Stump knew of BENLYSTA's suicide

side effect.  Stump's sales are suspicious given that his stock sales represented 87% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 134,000 |
| Shares Remaining After Sales | 19,576 |
| Total Shares Before Sales | 153,576 |
| **Total Proceeds from Sales** | **$3,818,094.60** |
| **% of Total Ownership Sold During SP** | **87.25%** |

81.    While in possession of this knowledge, defendant Barabe sold 115,380 shares of his personally held HGS stock for proceeds of $3,061,255.57.  Barabe's sales were timed to maximize profit from HGS's then artificially inflated stock price.  Barabe's sales are suspicious given that his stock sales represented 69% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 115,380 |
| Shares Remaining After Sales | 49,571 |
| Total Shares Before Sales | 164,951 |
| **Total Proceeds from Sales** | **$3,061,255.57** |
| **% of Total Ownership Sold During SP** | **69.95%** |

82.    While in possession of this knowledge, defendant Drews sold 112,902 shares of his personally held HGS stock for proceeds of $2,633,630.29.  Drews's sales were timed to maximize profit from HGS's then artificially inflated stock price.  Drews's sales are suspicious given that his stock sales represented 91% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 112,902 |
| Shares Remaining After Sales | 10,041 |
| Total Shares Before Sales | 122,943 |
| **Total Proceeds from Sales** | **$2,633,630.29** |
| **% of Total Ownership Sold During SP** | **91.83%** |

83.     In sum, defendants Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews sold over $37 million worth of stock was sold at artificially inflated prices as detailed by the chart below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BARABE** | 9/14/2009 | 35,273 | $20.00 | $705,460.00 |
| | 2/3/2010 | 22,907 | $27.92 | $639,480.97 |
| | 2/22/2010 | 57,200 | $30.01 | $1,716,314.60 |
| | | **115,380** | | **$3,061,255.57** |
| | | | | |
| **BATESON** | 7/21/2009 | 10,000 | $13.00 | $130,000.00 |
| | 8/26/2009 | 10,000 | $22.00 | $220,000.00 |
| | 10/19/2009 | 38,893 | $21.00 | $816,753.00 |
| | 11/2/2009 | 3,998 | $25.00 | $99,950.00 |
| | 11/2/2009 | 31,668 | $25.00 | $791,700.00 |
| | 11/2/2009 | 78,295 | $25.00 | $1,957,375.00 |
| | 11/2/2009 | 79,300 | $24.83 | $1,969,019.00 |
| | 11/3/2009 | 10,000 | $27.00 | $270,000.00 |
| | 12/21/2009 | 1,015 | $28.68 | $29,109.19 |
| | 12/21/2009 | 2,000 | $28.69 | $57,372.00 |
| | 12/21/2009 | 3,042 | $28.69 | $87,265.85 |
| | 12/21/2009 | 3,543 | $28.68 | $101,613.24 |
| | 12/21/2009 | 4,100 | $28.68 | $117,588.00 |
| | 12/21/2009 | 6,300 | $28.70 | $180,810.00 |
| | 12/22/2009 | 10,000 | $30.00 | $300,000.00 |
| | 1/4/2010 | 1,000 | $30.90 | $30,900.00 |
| | 1/4/2010 | 1,200 | $30.84 | $37,013.16 |
| | 1/4/2010 | 1,500 | $30.90 | $46,350.00 |
| | 1/4/2010 | 3,800 | $30.89 | $117,399.86 |
| | 1/4/2010 | 3,832 | $30.84 | $118,195.36 |
| | 1/4/2010 | 4,500 | $30.90 | $139,050.00 |
| | 1/4/2010 | 100 | $30.96 | $3,095.75 |
| | 1/4/2010 | 100 | $30.70 | $3,070.00 |
| | 1/4/2010 | 200 | $30.93 | $6,186.00 |
| | 1/4/2010 | 200 | $30.90 | $6,180.00 |
| | 1/4/2010 | 200 | $30.89 | $6,178.00 |
| | 1/4/2010 | 200 | $30.89 | $6,178.00 |
| | 1/4/2010 | 200 | $30.87 | $6,174.00 |
| | 1/4/2010 | 200 | $30.72 | $6,143.00 |
| | 1/4/2010 | 300 | $30.86 | $9,258.00 |
| | 1/4/2010 | 500 | $30.78 | $15,392.00 |
| | 1/4/2010 | 968 | $30.72 | $29,735.60 |

| | | | | |
|---|---|---|---|---|
| | 1/4/2010 | 1,000 | $30.95 | $30,950.00 |
| | 2/1/2010 | 20,000 | $26.49 | $529,874.00 |
| | 3/1/2010 | 85,200 | $28.08 | $2,392,509.72 |
| | | **417,354** | | **$10,668,387.73** |
| | | | | |
| **DAVIS** | 2/3/2010 | 134,000 | $27.69 | $3,711,049.60 |
| | 8/25/2010 | 2,195 | $28.01 | $61,489.41 |
| | 8/25/2010 | 23,805 | $28.00 | $666,540.00 |
| | 9/20/2010 | 26,000 | $30.01 | $780,234.00 |
| | | **186,000** | | **$5,219,313.01** |
| | | | | |
| **DREWS** | 6/28/2010 | 1,100 | $23.56 | $25,914.79 |
| | 6/28/2010 | 5,634 | $24.08 | $135,642.49 |
| | 6/28/2010 | 14,900 | $24.17 | $360,144.92 |
| | 6/28/2010 | 16,000 | $23.59 | $377,436.80 |
| | 6/29/2010 | 10,366 | $22.88 | $237,126.40 |
| | 6/29/2010 | 27,268 | $22.80 | $621,604.05 |
| | 6/30/2010 | 300 | $23.55 | $7,064.01 |
| | 6/30/2010 | 5,782 | $23.34 | $134,972.12 |
| | 6/30/2010 | 11,120 | $23.39 | $260,082.34 |
| | 6/30/2010 | 20,432 | $23.18 | $473,642.36 |
| | | **112,902** | | **$2,633,630.29** |
| | | | | |
| **LABINGER** | 11/30/2009 | 24,996 | $27.37 | $684,140.52 |
| | 11/30/2009 | 44,700 | $27.37 | $1,223,439.00 |
| | 7/26/2010 | 21,871 | $27.05 | $591,525.25 |
| | 8/26/2010 | 13,050 | $28.53 | $372,360.87 |
| | 8/27/2010 | 16,079 | $28.50 | $458,286.87 |
| | 9/1/2010 | 50,000 | $30.02 | $1,500,780.00 |
| | | **170,696** | | **$4,830,532.52** |
| | | | | |
| **SIMPSON** | 8/6/2009 | 200 | $14.55 | $2,910.00 |
| | 8/6/2009 | 534 | $14.56 | $7,773.71 |
| | 8/6/2009 | 2,500 | $14.59 | $36,475.00 |
| | 8/6/2009 | 3,200 | $14.60 | $46,717.12 |
| | 8/6/2009 | 3,800 | $14.56 | $55,318.12 |
| | 8/6/2009 | 4,800 | $14.56 | $69,888.00 |
| | 8/6/2009 | 7,421 | $14.60 | $108,346.60 |
| | 8/6/2009 | 21,774 | $14.60 | $317,900.40 |
| | 8/6/2009 | 44,726 | $14.60 | $652,999.60 |
| | 11/30/2009 | 36,923 | $27.37 | $1,010,582.51 |
| | 1/11/2010 | 326 | $30.77 | $10,030.27 |
| | 1/11/2010 | 385 | $30.91 | $11,900.35 |
| | 1/11/2010 | 400 | $30.83 | $12,332.00 |
| | 1/11/2010 | 628 | $30.56 | $19,191.68 |
| | 1/11/2010 | 800 | $30.89 | $24,712.00 |

| | | | | |
|---|---|---|---|---|
| | 1/11/2010 | 1,300 | $30.77 | $39,995.02 |
| | 1/11/2010 | 1,335 | $30.56 | $40,797.87 |
| | 1/11/2010 | 1,361 | $30.82 | $41,946.02 |
| | 1/11/2010 | 1,700 | $30.53 | $51,902.70 |
| | 1/11/2010 | 2,488 | $30.54 | $75,983.52 |
| | 1/11/2010 | 2,761 | $30.80 | $85,041.01 |
| | 1/11/2010 | 3,200 | $30.68 | $98,177.92 |
| | 1/11/2010 | 3,872 | $30.56 | $118,313.22 |
| | 1/11/2010 | 4,104 | $30.71 | $126,024.81 |
| | 1/11/2010 | 4,524 | $30.58 | $138,330.80 |
| | 1/11/2010 | 4,600 | $30.85 | $141,910.00 |
| | 1/11/2010 | 16 | $30.84 | $493.44 |
| | 1/11/2010 | 100 | $30.90 | $3,090.00 |
| | 1/11/2010 | 100 | $30.90 | $3,089.50 |
| | 1/11/2010 | 200 | $30.74 | $6,148.00 |
| | 1/11/2010 | 200 | $30.57 | $6,113.00 |
| | 1/11/2010 | 300 | $30.75 | $9,225.00 |
| | 1/11/2010 | 300 | $30.61 | $9,183.99 |
| | 2/16/2010 | 30,000 | $29.10 | $873,102.00 |
| | 4/12/2010 | 30,000 | $32.76 | $982,713.00 |
| | 6/11/2010 | 18,461 | $26.07 | $481,204.43 |
| | 8/25/2010 | 18,461 | $28.00 | $516,908.00 |
| | 10/1/2010 | 22,903 | $29.79 | $682,390.30 |
| | | **280,703** | | **$6,919,160.90** |
| | | | | |
| **STUMP** | 2/2/2010 | 50,000 | $27.40 | $1,370,020.00 |
| | 3/1/2010 | 50,000 | $28.07 | $1,403,700.00 |
| | 4/1/2010 | 34,000 | $30.72 | $1,044,374.60 |
| | | **134,000** | | **$3,818,094.60** |
| | | | | |
| **TOTAL** | | **1,417,035** | | **$37,150,374.63** |

84.     While defendants Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews sold some of their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun.  As such, Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews knew that HGS's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of the inference that they did not trade on the material adverse, non-public information.

## DAMAGES TO HGS

85.     The improper statements referenced above concerning BENLYSTA's association with suicide have devastated HGS's credibility as reflected by the Company's over $543 million, or nearly 11% one day loss in market capitalization.  The Company's market capitalization has continued to plummet since the FDA's disclosure linking BENLYSTA to suicide.  The present market capitalization has dropped nearly 70% since the truth about the Individual Defendants' improper statements came to light.

86.     Further, as a direct and proximate result of the Individual Defendants' actions, HGS has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and investigating two pending securities fraud class action lawsuits;

(b)     costs incurred from paying any potential settlement or adverse judgment in these class action lawsuits for violations of federal securities laws;

(c)     costs incurred from wasteful clinical studies for BENLYSTA given the results from these studies were concealed from the public;

(d)     costs incurred from wasteful research and development for BENLYSTA given the fact that the hidden truth about the drug's association with suicide may outweigh its value to lupus patients and the market;

(e)     costs incurred from the wasteful marketing efforts touting BENLYSTA as the biggest breakthrough for lupus patients in fifty years; and

(f)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to HGS.

87.      Moreover, these actions have irreparably damaged HGS's corporate image and goodwill.  For at least the foreseeable future, HGS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that HGS's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Considering the weight that is placed on a pharmaceutical company's credibility, the Individual Defendants' improprieties have caused long term damage to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.      Plaintiff brings this action derivatively in the right and for the benefit of HGS to redress injuries suffered, and to be suffered, by HGS as a direct result of violations of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  HGS is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.      Plaintiff will adequately and fairly represent the interests of HGS in enforcing and prosecuting its rights.

90.      Plaintiff was a shareholder of HGS at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current HGS shareholder.

91.      The current Board of HGS consists of the following twelve directors: defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young, as well as non-

defendants Collin Goddard, George Morrow, Greg Norden, and Allan Baxter.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Board's Conduct Is Not a Valid Exercise of Business Judgment**

92.     The sale, marketing, and use of pharmaceutical drugs are heavily regulated by the FDA.   This is because drugs intended to help cure may have injurious or even deadly consequences.   Although BENLYSTA was introduced to the market as a breakthrough drug bringing tremendous hope to those afflicted with lupus, when the truth regarding the drug's side effects emerged in the market, BENLYSTA sales fell significantly short of forecasts. BENLYSTA was associated with suicide in clinical studies of the drug leading as far back as 2003, and continuing on through 2009, with both attempted and committed suicides associated with clinical trial patients taking BENLYSTA.  The Individual Defendants, including a majority of the current Board were aware of or recklessly disregarded these results, and did not come forward with the truth.

93.     Instead, they issued numerous improper statements and raised hundreds of millions of dollars based on these improper statements.  The Board's challenged misconduct at the heart of this case constitutes a threat to the survival of the Company's core business.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on widespread improper statements regarding the safety of one of its most important products.  The improper statements dealt with life-threatening issues and yet the Board still chose a business practice that helped the Company maintain an artificially inflated stock price protecting their personal interests of prestige, power, and compensation.

94.     While protecting their own personal interests, the Board risked the corporate image and well-being of the Company.  Causing the Company to engage in these improper and deficient practices that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young Face a Substantial Likelihood of Liability for Their Misconduct**

95.     ***Eight of the twelve current directors***, defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young are named in the pending securities fraud class action lawsuits pending in the United States District Court, for the District of Maryland.  Each of these eight current directors made improper statements regarding BENLYSTA and its serious side effects and association to suicide in the Company's Registration Statements, press releases, and SEC filings.

96.     ***Eight of the twelve current directors***, defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young were directors during the time period when they, in addition to other non-director defendants, issued improper statements in the Company's public filings and press releases, thus harming the Company and unjustly enriching the Insider Selling Defendants.  Given their supervisory role as directors of the Company, the wrongdoing alleged herein evidences a pattern of conduct on the part of Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young (a majority of the current Board), that shows a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence.

97.     The Audit Committee Defendants, defendants Danzig, Ha-Ngoc, and Lawlor, reviewed and approved the improper statements contained within the Company's reports and press releases filed with the SEC by virtue of their role as members of the Audit Committee. Among the current and former members of the Audit Committee, two of the Director Defendants, Ha-Ngoc and Lawlor, have been determined to be "audit committee financial experts" with possession of the requisite financial and accounting expertise and knowledge regarding the Company's financial reporting process and internal controls.   Ha-Ngoc is the current Chairman of the Audit Committee.   Owing to their specialized expertise and heightened duties under the Audit Committee Charter, the review and subsequent approval of HGS's improper statements is particularly egregious. The Audit Committee Charter provides that the Audit Committee Defendants owe a heightened responsibility to HGS and its shareholders, in that they are responsible for compliance with accounting, legal, and regulatory requirements. According to the Charter, the Audit Committee Defendants are appointed to monitor "1. the integrity of [HGS's] financial statements and other financial statements provided by the [Company] to its stockholders, 2. [HGS's] compliance with legal and regulatory requirements, 3. [HGS's] relationship with [its] independent accountants, including their engagement, performance, qualifications and independence, and 4. the performance of [HGS's] internal audit function, internal controls and disclosure controls."   As such, the Audit Committee Defendants were uniquely responsible for allowing the improper statements related to the Company's potential drug BENLYSTA.   Moreover, the Audit Committee Defendants reviewed and approved the improper press releases and SEC filings made to the investing public, and, despite their access to adverse and material, non-public information associating BENLYSTA with

suicide, caused and allowed such improper statements described herein. Thus, the Audit Committee Defendants, and, in particular, HGS's Audit Committee financial experts – current Chairman of the Audit Committee, defendant Ha-Ngoc, and former member of the Audit Committee, defendant Lawlor – have demonstrated actions taken in bad faith that constitute breaches of their fiduciary duties, and as such, any demand upon them would have been futile.

98.    Demand is excused because the majority of the members of the Board, i.e., defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young are interested in the outcome of this litigation, having issued improper statements to the investing public in breach of their fiduciary duties. Consequently, these directors face a substantial likelihood of liability and are interested in the outcome of this action.

99.    Demand upon the Board is further excused because the damage to the Company alleged herein is a direct result of a majority of the Board's failure to implement internal controls and oversee and manage the Company as they were obligated to do.  Accordingly, the Board cannot exercise independent objective judgment in deciding whether to bring this action because they are personally interested in the outcome of this lawsuit as it is their actions that have subjected HGS to potential liability and harm.

**Demand Is Excused Because a Majority of the Board Lacks the Independence Necessary to Prosecute Suit**

100.    Defendant Watkins lacks independence due to the fact that he served and continues to serve in the position of President and CEO of HGS. The principal professional occupation of Watkins is his employment as President and CEO of HGS, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, which are material to Watkins.  According to the Company's most recent proxy statement filed

with the SEC on March 30, 2011, the Company acknowledges that Watkins lacks independence, due to his interest in maintaining his executive positions at HGS, which renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.  HGS paid Watkins the following compensation:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $716,923 | $8,438,175 | $550,000 | $150,225 | $9,855,323 |
| 2009 | $700,000 | $131,100 | $1,050,000 | $30,501 | $1,911,601 |

Accordingly, Watkins is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to Watkins.

101.    Further, any suit by the Company to remedy these wrongs would likely expose defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, Young, and HGS to further liability for violations of the federal securities laws, in that it no doubt would result in additional civil actions being filed against them (and would further strengthen the existing civil litigation against the Company and these Individual Defendants). Thus Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young are hopelessly conflicted in making any supposedly independent determination of whether the Company should sue the Board. Thus far, at least two class action complaints for violations of the federal securities laws have been filed in the United States District Court for the District of Maryland against the Company as a result of the wrongdoing set forth herein.

102.    HGS has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet the Board has not authorized the Company to file a

lawsuit against the Individual Defendants or others who were responsible for the wrongful conduct to attempt to recover for HGS any part of the damages the Company suffered and will suffer thereby.

103.    Despite the Board having knowledge of the facts underpinning the claims and causes of action raised by plaintiff, the Board has failed and refused to seek to recover for HGS in connection with any of the wrongdoing alleged by plaintiff herein.

104.    If defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young are protected against personal liability for their acts of mismanagement and breach of fiduciary duties as alleged in this Complaint by directors and officers' liability insurance ("D & O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of HGS.   However, the D & O Insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by HGS against these defendants, known as the "insured versus insured exclusion."   As a result, if these directors were to cause HGS to sue themselves and certain of the officers of HGS, there would be no D & O Insurance protection and thus, a further reason why the directors will not bring suit upon themselves. On the other hand, if this suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no D & O Insurance, then the Board will not cause HGS to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

105.    The Board cannot exercise independent objective judgment in deciding whether to bring this action because a majority of its members (defendants Watkins, Karabelas, Danzig, Ha-

Ngoc, Lawlor, Gowen, LaMattina, and Young) are personally interested in the outcome of this lawsuit as it is their actions that have subjected HGS to liability. Further, the actions and inactions complained of herein are violations of these eight current directors' fiduciary duties and are incapable of ratification.

106.    Accordingly, for all of the foregoing reasons, making a pre-suit demand on the Board would have been futile, and thus is excused.

107.    Plaintiff has not made a demand on the shareholders of HGS to institute this action because such demand would be a futile and useless act for at least the following reasons:

(a)    HGS is a publicly held company with over 198 million shares outstanding and thousands of shareholders;

(b)    making demand on such a large number of shareholders would be impossible for plaintiff, who has no way of learning the names, addresses, or phone numbers of all of the Company's shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of HGS and because of their ability to control the business and corporate affairs of HGS, owed the Company fiduciary obligations of due care, good faith, and loyalty, and

were and are required to use their utmost ability to control and manage HGS in a fair, just, honest, and equitable manner.

110.    The Officer Defendants knowingly, recklessly, or with gross negligence: (i) issued improper statements regarding the serious side effects associated with its new purported breakthrough lupus treatment; (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements; (iii) failed to properly manage and oversee the Company; and (iv) wasted corporate assets.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

111.    The Director Defendants owed HGS the highest duty of loyalty, and breached this duty when they knowingly, recklessly, or in conscious disregard of their duties: (i) issued improper statements regarding the serious side effects associated with its new purported breakthrough lupus treatment; (ii) failed to establish and maintain internal controls which would have prevented the Company from disseminating these improper statements; (iii) failed to properly manage and oversee the Company; and (iv) wasted corporate assets.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

112.    The Insider Selling Defendants breached their duty of loyalty by selling over $37 million of their personally held HGS stock on the basis of their knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's business prospects.  It was a proprietary asset belonging to the Company, which these Insider Selling Defendants used for their own benefit when they sold HGS stock.

113. The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or in conscious disregard of their duties reviewing and approving the improper statements regarding the serious side effects associated with the Company's new purported breakthrough lupus treatment. As such, the Company is accused of violating various federal securities laws, including the Exchange Act. Additionally, this constituted a violation of the heightened and specialized duties of the members of the Audit Committee under its Charter.

114. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

115. Plaintiff, on behalf of HGS, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. As a result of the Individual Defendants' misconduct, and by failing to conduct proper supervision, the Individual Defendants have caused HGS to incur (and likely to continue to incur) significant legal and investigatory costs to defend itself as a result of the Individual Defendants' unlawful actions. The Company faces hundreds of millions of dollars in potential legal liability and has already wasted its assets by paying improper compensation and bonuses to its directors that have breached their fiduciary duties and caused this burden in the first place.

118. As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

119. Plaintiff, on behalf of HGS, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.     By their wrongful acts, omissions, and breaches of fiduciary, the Individual Defendants were unjustly enriched at the expense of and to the detriment of HGS. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to HGS.

122.     Defendants Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews sold HGS stock while in possession of material adverse, non-public information that, in being concealed, allowed the share price of HGS stock to remain artificially inflated.  As a result, Bateson, Simpson, Davis, Labinger, Stump, Barabe, and Drews profited from their misconduct and were unjustly enriched through their exploitation of material and adverse, inside information.

123.     Plaintiff, on behalf of HGS, seeks restitution from the Individual Defendants, and each of themselves, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from or in the course of their wrongful conduct and fiduciary breaches.

124.     Plaintiff, on behalf of HGS, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of HGS, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing HGS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HGS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's disclosure controls and procedures;

2.      a proposal to create a committee tasked with communicating material, adverse results during research and development to the Board and management;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.      a provision to permit the shareholders of HGS to nominate at least three candidates for election to the Board; and

5.      a provision to control insider selling;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of HGS has an effective remedy;

D.     Awarding to HGS restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: January 17, 2012

/s/ Nicholas A. Migliaccio
Nicholas A. Migliaccio (Md. Bar # 29077)
Gary E. Mason (Md. Bar. #15033)
1625 Massachusetts Ave., NW
Suite 605
Washington, DC  20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
E-mail: nmigliaccio@masonlawdc.com
        gmason@masonlawdc.com

ROBBINS UMEDA LLP
Brian J. Robbins
Felipe J. Arroyo
Shane P. Sanders
Kevin S. Kim
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
E-mail: brobbins@robbinsumeda.com
E-mail: farroyo@robbinsumeda.com
E-mail: ssanders@robbinsumeda.com
E-mail: kkim@robbinsumeda.com

Attorneys for Plaintiff

688908